Good morning. My name is Eric Seitz and I represent the plaintiff appellant in this case. I would like to begin by saying that although the plaintiff did not have probable cause to arrest Mr. Arakat for the commission of a crime, the Honolulu police decided to use what they believed to be an alternative basis for effecting his arrest, namely to have him taken involuntarily to a hospital for an examination by a psychiatrist. What the police failed to realize is that the involuntary mental health procedure requires a reasonable suspicion that the subject is both mentally ill and an imminent threat to himself or others. The magistrate of the district court made a reference to his having represented or told the FBI that he was prepared more or less to take matters into his own hand, and I'm paraphrasing, I believe, what are some information in the FBI notes where he said, I can't take this anymore, I'm going to get a gun, I'm going to shoot and all of that. Were those notes ever put before the jury? No. Nothing from the FBI was ever there other than the statement that Detective DeCary said that she had received when she verbally spoke to Agent Crist at some prior time. And those discussions, by the way, occurred a month or more earlier at a point in time when my client was complaining that his competitors in the security business, which is a notorious business, had been threatening him. But a month passed, nothing ever happened, he never did anything, and then Mr. Engel walks in and Mr. Engel makes these outlandish descriptions of my client, including descriptions that my client had assaulted him and threatened him. He said he pushed him against the wall. Yes. He said he assaulted him, he pushed him against the wall. None of those facts was sufficient to cause the police to arrest Mr. Arracot for a crime, but they decided as an alternative, we'll invoke this other procedure, and that's what they did. Weren't there other factors beside that? Well, I'm not sure what factors your --. Well, it's your case. I'm just saying weren't there other factors beside what you just recited? That the police took into account? Sure. No, I don't believe there were, Judge. Counsel is going to tell us, but I'm just wondering what you're going to say. What I'm telling you is that Mr. Engel walked in, Mr. Engel was interviewed both by the Detective DeCary and by Sharon Black, who was the, quote, mental health advisor, and you have in the record the form that Sharon Black filled out. And what Mr. Engel said was that he had been assaulted by my client, my client had been waving a gun in his apartment. This is all happening now a month or longer before, sometime back in November, that my client had airplanes in his apartment that resembled the fact that the planes that flew into the Twin Towers, and that Mr. Engel thought he was a terrorist. That's what they relied upon. How about guns around and ammunition? Oh, he had three guns that were legally registered, because he ran a security business in which guns were essential for the purpose of fulfilling Federal contracts. Didn't he say something about the apartment being disarray and there was ammunition on the floor? He said that as well, yes. Didn't he say that there were holes in the wall that were plugged up with duct tape because he thought somebody was spying on him? That's what Mr. Engel reported. Mr. Engel, mind you, a 20-year drug addict himself who had serious history of mental illness and who had been around to several agencies filing complaints of Mr. Arakat because Mr. Arakat fired him. So there was no evidence. The evidence in the record is clear, and the detectives said that, that they didn't believe Mr. Engel sufficiently to create probable cause to arrest my client for the commission of a crime. What did they have to show relative to the fact to get him into an emergency mental health examination? They had to show that he had a mental illness, a serious mental illness, and that he was an imminent threat to himself or to others. Did you do anybody make any objection to Instruction 25 which described what they had to show? Nobody made an objection because it was based upon the statute. That's right. And that statute, as I read it, that they have to show that the police officer had to believe that the person is an imminent dangerous, eminently dangerous to self or others or is gravely disabled or is obviously ill. Yes. However, I think basically the case law is such that there has to be not the word or but and. He has to both have an underlying condition and be imminently dangerous. That's correct. And in this case It's all in the disjunctive. It says or, or, or. It is. However, I think the case law in this Court and the case law everywhere that we found requires that the statute be read to require both elements. Otherwise, you can go around and pick up somebody who has a history of mental illness who's not an imminent threat, and that would create a grave situation for people in the community who have mental illness. So I don't think there's any question that in order to invoke this procedure constitutionally to establish sufficient probable cause to invoke a mental health procedure, you have to have both elements. And the problem here in this particular case is that nobody certified that Mr. Well, help me with the series, how this went. It seems to me after Engle makes the report, FBI, FBI talks to D'Caria. D'Caris. D'Caris. D'Caris looks it over. Then D'Caris takes what all this, all these things put into play and gives it to Black, who's now within the department but is a mental health consultant. Yes, but she has no credentials other than a bachelor's degree. Well, nobody did here. That's correct. So did they have to go out to the medical community and get an opinion? No. They did not have to under the statute. What they had to do was to fill out the form, the MH-1, which Black did, and it's in the record. And then the police go out and they look for Mr. Arakat. And in these circumstances, we contend that somebody had to talk to Mr. Arakat, observe him, and determine whether the information, which was relatively stale, was confirmed by his behaviors to show that he was of such a nature that they had probable cause at that time to seize him. Nobody did that. There was no MH-1 that was ever signed by anybody who saw Mr. Arakat. The important thing here is Sharon Black didn't sign it, and she testified she couldn't sign it, although she later changed her testimony. But in her deposition and at trial initially, she said, I didn't sign it because I didn't know whether he posed an imminent threat or not. The police officers who went out there spent 45 minutes with Mr. Arakat, trying to determine what to do with him and talking to him. They all testified. They saw no evidence of any imminent threat, and they were waiting for instructions. Ms. DeCaris was giving instructions, but in the meantime, importantly, she was trying to contact the FBI, as was Mr. Miranda, the head of the tax squad that went out there. And the FBI kept repeatedly saying, we don't want any part of this. Tread carefully. We have no indication that Mr. Arakat is a terrorist, which was what was driving these events. So tread carefully. Ms. DeCaris thought she had a terrorist who had guns who was dangerous. She wanted the guns, and that's what drove this case. So we have the unprecedented situation where they took Mr. Arakat, they arrested him, they put him in a van, they talked to him and observed him for 45 minutes, waiting for further advice. Only then did they take him to his office where they seized the guns, and only then did they take him to the hospital where the doctor immediately concluded with the advice of a psychiatrist that Mr. Arakat had been brought there inappropriately. You never had an MH-1 form filled out. Nobody who saw him ever certified that he was of such a nature that he could be subjected to this. So you're saying the jury verdict was not substantiated by the evidence presented? The first thing I'm saying, Judge, is that the issue that was presented to the jury improperly was whether there was probable cause. Probable cause is a judicial determination, not a jury question. Judge Curran in this case wrote an appropriate opinion in which he rejected qualified immunity, which could be a jury question. But he found there was no qualified immunity in this case. The case then went to the jury on probable cause. And in his subsequent written order, Judge Curran found there was substantial evidence to support the jury's finding of probable cause. It could not and should not have gone to the jury on that basis. I'd like to reserve my last minute, if I may, for rebuttal. Good morning, Justice Reinhart, Justice Bruchetta, and Justice Fischer. May it please the Court. My name is Marie Manuel-Gavigan, and I represent the defendants' affilies in this case. Breyer, by the way, we're judges, not justices. There's no justice in the Ninth Circuit. Oh, I'm sorry, judges. I'm sorry. I tried. It's okay. It's not you're not alone in making a mistake. The issue that was presented in the appeal by the appellant was whether the trial court erred in not granting his post-trial motion for judgment as a matter of law. What's the standard or standard of review on that? What is our standard of review for that decision? Your standard of review is it won't be overturned. Sorry. I apologize. Taking the evidence in the light most favorable to the non-moving party, the court must determine whether there's sufficient evidence to support the verdict. So sufficient evidence case, right? Correct. Before a jury, jury verdict. Yes. Counsel just argued, leaving his argument, he said that the issue was wrong, that the judge should never have submitted the probable cause issue to the jury. Is that an issue in this case? I didn't see that in the pleadings, Your Honor. Neither did I. So let's go to your issue then. Was there sufficient evidence to support the jury verdict? Yes, Your Honor. There was sufficient evidence in this case. The court had, if I just may for a moment, when the defendants filed their motions for summary judgment, the court ruled that there were fact issues that had to be determined. And that's why the court ruled that. That doesn't really matter now. After the trial. The jury verdict. After the trial, what was the sufficient evidence? The sufficient, okay. Because going back to what you said, we're reviewing a motion notwithstanding a verdict, what were the facts to support the jury verdict? Okay. The facts were that Officer DeCaris had been contacted by the FBI about Mr. Erekat. And on the 15th of December, the day that they picked him up, she had been contacted by her assistant chief, who had been contacted by the Attorney General's office saying that there had been a concern that Mr. Erekat might be a threat to others or might commit suicide. And so there was the concern from the FBI. There was a concern from the Attorney General's office. Officer DeCaris spoke with the FBI agent who gave her the details of what he knew. Officer DeCaris. What are the facts? I mean, what did he do that made the police have reason to believe that he was in imminent danger and that he had a serious mental problem? The fact Officer DeCaris learned from the FBI that Mr. Erekat had been there complaining that people were trying to harm him, that people were trying to hurt his business, that people had put some type of a bug in his computer, that someone was doing something with his bank account. What has that got to do with being a danger to anybody? You may be paranoid, but let me focus on the fact that caught my eye in Judge Kern's written ruling in this, because I think it goes to the danger point. It's at page three of his opinion. Happily, it's also page three of the record, apparently. And I'm looking at the bottom of the page. It says, Chris told DeCaris that he was concerned about plaintiff's potential for violence, as plaintiffs believed people were conspiring against him, which is what you were just saying. But then Judge Kern goes on to say, and had stated that he may take matters into his own hands if he didn't receive help from the FBI. Now, where did the jury get that information? I just understand from counsel that that was not something that was presented to the jury. That, I believe, came from the testimony of DeCaris. Where? Can you cite to me where DeCaris said that? I've looked for it. I haven't found it. So if you've got it, I would be greatly enlightened. I cannot put my fingers on it at this moment, Your Honor. Would that be your answer to Judge Fischer's question, how we could substantiate what the judge said? That would have to be from DeCaris's testimony? Yes, Your Honor, because DeCaris would have said that. Nowhere else. My understanding is there were not exhibits. No one from the FBI testified in the trial. And I don't believe that was an exhibit. There were FBI notes. Did the jury see the FBI notes? I don't believe that was an exhibit, Your Honor. In fact, if they had seen the notes, they would have said that he said he might kill Martinez if something happened. And then the FBI told him killing was a crime, and he said he wouldn't really kill anyone because he had a family that relied on him for support. That may be why nobody introduced the FBI notes. There was a motion limiting with regard to the notes, and it was ruled in your favor that if you wanted to use them, you could. But I couldn't find that they were ever admitted into evidence. I don't believe the notes were admitted, Your Honor. So what did the jury have about danger, immediate danger? Judge Curran seemed to think that they had that information. If they didn't, then what did they have? Your Honor, Officer DeCaris had interviewed Mr. Engle at length, and Mr. Engle had told DeCaris about being in the apartment, how Mr. Erekat was waving the gun, how he thought there were people around. He made statements that were of concern to Mr. Engle, obviously, and Mr. Engle testified at trial, and he testified himself about what he had observed when he had been in the apartment. Mr. Engle also testified that he had been shoved by Mr. Erekat. Mr. Engle testified that he felt threatened himself and he had a fear for the safety of his family because of Mr. Erekat's behavior. Well, you know, if shoving somebody is enough to get you to say you're in imminent danger and you have a mental disease, you know, a lot of people in this country would be in insane asylums. Your Honor, that's just one piece, but you have to put it together with everything that Mr. Engle observed, because Mr. Engle was in an apartment that was in complete disarray, and he saw Mr. Erekat in a state that made him think that there was something wrong, because when he went to the apartment, you know, Mr. Erekat was looking around, was screaming profanities at the wall and the ceiling. That was a part of the case, because Mr. Erekat was a person who was not used to being looked at.  Mr. Engle testified that he had been in an apartment that was in complete disarray, and he saw Mr. Erekat in a state that made him think that there was something wrong, and he saw Mr. Erekat in a state that made him think that there was something wrong. The apartment was being cleaned at that time when the police arrived. I mean, they saw him. They talked to him. They observed his apartment. Was there anything that led the police to believe that he was a danger to anyone? Well, where the police picked him up was in a hotel, because Mr. Erekat had vacated his apartment, and he was moving around, because he felt he was a target. And one of the officers, when he was in the van, prior to going back to his business before he went to the hospital, he was telling one of those officers about his fears that people were trying to take his business or could hurt him, those types of things. And that officer testified. That was before the jury. That officer testified that he thought that was strange was not his word, but that was the effect of his testimony, that it was something that was odd. Does it ever happen that people in the security business are trying to take other people's business? Your Honor, I believe in all businesses, people probably want to take other people's businesses. But ---- I have a hard time, from your answers, understanding what it was that would have led anybody to believe that he was mentally ill and an immediate danger to somebody. This statute is not like the ordinary one. It's a particularly strict statute about being an imminent danger to others. Can I come back to one more part of the magistrate judge's ruling? On page 4, he says, Did Dakaris testify? Did Dakaris testify? Did she say just what the judge's ruling says was, what I just quoted? She ---- my recollection is that she did testify about her call to Crist. Did she say that he said that he told her of his concern of plaintiff's mental health and possible danger to others? Is that what she's testifying? That is my recollection, that she testified as to that, yes, Your Honor. Using those words? Or words that said possible danger to others? Well, the possible danger to others, I don't know if he used those exact ---- if she used those exact words, but she did testify as to what she had learned from FBI agents. She said that Crist told her that Engle told him that he was a danger. Engle had spoken with the FBI agent, but also Mr. Ericat himself had spoken with the FBI, and Mr. Ericat ---- And what the FBI notes show that he said is he would not harm anybody, that he had a family, and that he wouldn't really do anything. Was it anything that he said to the ----  I see that my time is up, unless there's any further questions. Okay. Thank you. Let me just clarify. Mr. Engle testified that his observations in Mr. Ericat's apartment occurred a month or more prior to the date on which ---- I thought it was December 12th. No. The last time that Mr. Engle was in Mr. Ericat's apartment was in early November. The arrest occurred on December 15th. The incident in the parking lot occurred in December, the week prior to the arrest. But the observations in Mr. Ericat's apartment were more than a month prior. I also just briefly want to suggest to you to read very carefully, there are two cases cited by the magistrate, Ahearn, and the other case is a case entitled Chathas, C-H-A-T-H-A-S versus Smith. If you look and compare the facts in the Chathas case in particular, you will see that in that case, although the police did not themselves observe the individual before they took him in for a psychiatric examination, they had a fresh evaluation from a psychiatrist who had examined this man just a day or two earlier and described him as being heavily depressed and being a time bomb that was about to explode. You have nothing comparable in this case to those kinds of incidents. And then in the other case, which he cites, Ahearn, you have a finding in Ahearn that there was probable cause to arrest the man for the crime. You don't have probable cause to arrest Mr. Ericat in this case for any criminal behavior, hence the reliance upon the other procedure, which we believe was not justified under the circumstances and the facts in the record. Thank you very much. Thank you. Thank you, counsel. Case disargued will be submitted. Court will take a short break before the final case of the morning. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. We obviously aren't as exciting as the rest of the people that appeared before us. Thank you. Thank you.   Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Reinhardt, Brunetti, Fisher